# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | CRIMINAL NO. 21-255 (RC) |
| v. : | |
| EMMA CORONEL AISPURO : | **FILED** |
| : | JUN 10 2021 |
| Defendant. : | Clerk, U.S. District and Bankruptcy Courts |

## STATEMENT OF FACTS

Were this case to proceed to trial, the United States of America would prove the following facts beyond a reasonable doubt:

1. This statement of facts is not intended to constitute a complete statement of all facts known by Defendant Emma Coronel Aispuro (hereinafter, "Defendant"), but is a minimum statement of facts intended to provide the necessary factual predicate for her guilty plea and sentencing. The limited purpose of this statement of facts is to demonstrate that there exists a sufficient legal basis for Defendant's plea of guilty to the charged offense, which carries with it a statutory mandatory minimum sentence. The Government submits that had there been a trial in this matter, the Government would have proven each of the facts as outlined beyond a reasonable doubt, and further that the facts satisfy each of the essential elements of the charge, as well as the amount and type of drugs involved, to which the Defendant is entering her plea.

2. Beginning in or about 2011 and continuing to at least January 19, 2017, in the United States, Mexico, and elsewhere, the Defendant was part of a conspiracy, the object of which was to distribute five (5) kilograms or more of a mixture or substance containing a detectable

amount of cocaine, (1) kilogram or more of a mixture or substance containing a detectable amount of heroin, five hundred (500) grams or more of a mixture or substance containing a detectable amount of methamphetamine, and one thousand (1000) kilograms or more of a mixture and substance containing a detectable amount of marijuana, knowing, intending, and having a reasonable cause to believe that such substances would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959(a), 960, 963, and Title 18, United States Code, Section 2.

3. Further, beginning in or about 2011 and continuing to at least January 19, 2017, in the United States, Mexico, and elsewhere, the Defendant did unlawfully, knowingly, and intentionally conspire with others known and unknown to conduct one or more financial transactions involving the proceeds of a specified unlawful activity, to wit, the importation into the United States of controlled substances, in violation of Title 21, United States Code, Sections 959(a), 960, and 963, knowing that the funds involved were the proceeds of unlawful activity, with the intent to promote a specified unlawful activity, to wit, the importation into the United States of controlled substances, in violation of Title 21, United States Code, Sections 959(a), 960, and 963, all in violation of Title 18 United States Code, Sections 1956(a)(1)(A)(i), and 1956 (h).

4. Additionally, beginning in or about 2007 and continuing to the date of her arrest, on February 22, 2021, the Defendant maintained possession and control of properties in which an individual classified as a Significant Foreign Narcotics Trafficker under Title 21, United States Code, Sections 1903(b) and 1907(7) had an interest. The Defendant's possession and control of these properties violated Title 21, United States Code, Sections 1904(c)(1), 1904(c)(2) and 1906(a).

5. In 2007, the Defendant married Joaquin Guzman Loera, aka, "El Chapo" (hereinafter "Guzman). At that time, Guzman was a principal leader of the drug trafficking organization (hereinafter "DTO") known as the Sinaloa Cartel along with his partner, Ismael Zambada Garcia, also known as, "El Mayo."

6. On June 1, 2001, Guzman was identified by the President of the United States as a Significant Foreign Narcotics Trafficker under Title 21, United States Code, Sections 1903(b) and 1907(7).

7. As a result of Guzman's designation as a Significant Foreign Narcotics Trafficker, Guzman's assets, including property and interests in property within the possession or control of any "United States Person," as defined by Title 21, United States Code, Section 1907(6), are blocked pursuant to Title 21, United States Code, Section 1904(b).

8. The Defendant is a United States citizen and, accordingly, is a "United States Person" as defined by Title 21, United States Code, Section 1907(6).

9. From the time that the Defendant married Guzman in 2007 until the date of her arrest, on February 22, 2021, the Defendant benefitted from the proceeds of Guzman's drug trafficking activity in multiple ways. The Defendant received direct monetary support from Guzman. Further, the Defendant lived in, possessed, and controlled residences paid for by Guzman's drug trafficking proceeds. Additionally, the Defendant possessed and controlled properties paid for by Guzman's drug proceeds which included both residential properties and commercial properties. The Defendant derived income from renting the residential and commercial properties purchased by Guzman's drug proceeds which she possessed and controlled.

10. Accordingly, the Defendant maintained possession and control of a variety of properties in which Guzman has an interest from in or about 2007 until at least February 22, 2021.

The Defendant acknowledges that this possession and control was in violation of Title 21, United States Code, Sections 1904(c)(1). 1904(c)(2), and 1906(a).

11.     From the time that the Defendant first came into contact with Guzman on or about 2007 until January 19, 2017, when Guzman was extradited to the United States to face criminal charges of his own, the Defendant was aware that Guzman was a leader of the Sinaloa Cartel, a DTO dedicated to the illegal trafficking of narcotics from Colombia through Central America, Mexico, and then into the United States. The Defendant knew that Guzman and the DTO generated millions of dollars in cash drug proceeds in the United States each year as a result of its illegal drug trafficking activity.

12.     On February 22, 2014, Guzman was arrested in Mazatlán, Sinaloa, Mexico by Mexican law enforcement officials. Following his arrest, Guzman was designated to Altiplano prison located in "Estado de Mexico", a Mexican State (hereinafter "Altiplano"). Shortly thereafter, the United States government formally requested that Guzman be extradited from Mexico to the United States.

13.     Following Guzman's incarceration, the Defendant visited Guzman in Altiplano. Guzman utilized the Defendant as a messenger to deliver messages to members of his DTO. The messages delivered by the Defendant allowed Guzman to maintain control and order over his DTO despite the fact that he was in prison. In this regard, the messages passed by the Defendant on Guzman's behalf allowed the DTO to continue to import controlled substances, including cocaine, heroin, methamphetamine, and marijuana, into the United States.

14.     When the Defendant visited Guzman in Altiplano, Guzman instructed the Defendant that he wanted her to organize an escape from Altiplano via an underground tunnel. To finance and plan for the escape from Altiplano, Guzman instructed the Defendant to

communicate with other members of the DTO including his four sons, Ivan Archivaldo Guzman Salazar (hereinafter "Ivan"), Jesus Alfredo Guzman Salazar (hereinafter "Alfredo"), Ovidio Guzman Lopez (hereinafter "Ovidio"), and Joaquin Guzman Lopez (hereinafter "Joaquin"), as well as colleagues, including a co-conspirator referred to herein as "Co-Conspirator 1", and an individual known to the Defendant as "Cleto."

15.    Following her visit with Guzman at Altiplano, the Defendant met with Ivan, Alfredo, Ovidio, and Co-Conspirator 1. The Defendant communicated Guzman's orders regarding the tunnel escape to all present. The Defendant, Ivan, Alfredo, Ovidio, and Co-Conspirator 1 agreed to pursue the construction of an underground tunnel linked to Altiplano in an effort to help Guzman escape from Altiplano. The Defendant agrees that by making efforts to help Guzman escape from Altiplano, she was necessarily aiding and abetting the goals of the DTO of which Guzman was a leader. The Defendant agrees that the goals and objectives of the DTO were, specifically, the importation of controlled substances including cocaine, heroin, methamphetamine, and marijuana, into the United States, and the return of the proceeds from the sale of those controlled substances to the DTO.

16.    Following her visit with Guzman at Altiplano, the Defendant also met with the individual known to her as Cleto. Guzman told the Defendant that Cleto was holding money which belonged to Guzman. The Defendant knew that the money held by Cleto was money illegally derived from the sale of heroin which was ultimately imported into the United States. The Defendant asked Cleto to provide her with the money that Cleto owed to Guzman. As a result of her meeting with Cleto, the Defendant later received five separate bulk cash deliveries totaling approximately $1,000,000 from Cleto. Through intermediaries, the Defendant delivered

a portion of the money provided by Cleto to Altiplano prison personnel in an effort to arrange for favorable prison conditions for Guzman and to facilitate Guzman's escape from Altiplano.

17. In furtherance of the efforts to assist in Guzman's prison escape, the Defendant also met with another individual known to her as "Lazaro." The Defendant asked Lazaro to purchase real property in the area near Altiplano so that a tunnel connecting the outside world to Altiplano could be constructed. Following her conversation with Lazaro, the Defendant related her conversation with Lazaro to Ivan, Alfredo, Ovidio, and Joaquin. Ivan, Alfredo, Ovidio, and Joaquin transferred money to Lazaro after speaking with the Defendant. The money transferred to Lazaro was used to purchase land in the area of Altiplano.

18. The Defendant was aware that Ivan, Alfredo, Ovidio, and Joaquin contracted engineers to begin construction on a tunnel underneath the land purchased by Lazaro in the area of Altiplano. The Defendant remained updated on the progress of the tunnel construction. Throughout tunnel construction, the Defendant visited Guzman in Altiplano and provided him with updates regarding the status of construction.

19. The Defendant, and others, made payments to the prison guards at Altiplano to help to ease the Defendant's entry into the prison. These payments were made so that the Defendant could visit Guzman more comfortably and so the prison guards would bring certain comfort items to Guzman, such as food not readily available to other inmates at the facility. Under this arrangement, and in an effort to assist with Guzman's escape, the Defendant arranged for a GPS watch disguised as a food item to be delivered to Guzman by a prison guard. The GPS watch was delivered to Guzman approximately six months after tunnel construction began. The GPS watch was used to mark the location of Guzman's cell within Altiplano so that the tunnel

engineers would know toward which specific geographic coordinates to construct the underground tunnel.

20. Tunnel engineers were able to construct the tunnel entry directly underneath Guzman's cell at Altiplano with an entryway placed underneath the shower in his cell. On July 11, 2015, Guzman escaped from Altiplano maximum security prison via the underground tunnel. Thereafter, Guzman relocated to a mountain location within the Mexican state of Durango. The Defendant reunited with Guzman upon his arrival in Durango.

21. While he was a fugitive, Guzman resumed his leadership role in the Sinaloa Cartel and resumed his drug trafficking activities. Guzman remained in fugitive status until he was arrested on January 8, 2016. Guzman was arrested in Los Mochis, Sinaloa, Mexico by Mexican law enforcement officials. Upon his arrest, Guzman was again designated to Altiplano prison in Mexico State. Again, the United States government formally requested that Guzman be extradited from Mexico to the United States.

22. Approximately one month after Guzman's second placement in Altiplano, the Defendant went to Altiplano to meet with him. Guzman informed the Defendant that he wanted her to, again, help to facilitate an escape by constructing another tunnel to Altiplano. Following her meeting with Guzman at Altiplano, the Defendant communicated with Co-Conspirator 1 and also met with Ivan, Alfredo, Ovidio, and Joaquin to discuss Guzman's order.

23. The Defendant delivered bulk cash to Co-Conspirator 1 in an effort to arrange for favorable prison conditions for Guzman and to potentially facilitate another escape from Altiplano. The amount the Defendant delivered to Co-Conspirator 1 was close to, but did not exceed, $1,000,000.00.

24. Guzman was transferred to a different prison facility in Ciudad Juarez, Chihuahua, Mexico (hereinafter "Juarez") in May 2016. The location of the Juarez prison and other logistical concerns related to the facility made an escape from the new confinement location less feasible than an escape from Altiplano. The Defendant communicated with Co-Conspirator 1 about Guzman's movement to Juarez and discussed with Co-Conspirator 1 whether Guzman would be transferred back to Altiplano so that efforts to help Guzman escape from Altiplano could continue. The Defendant was aware that a $2,000,000 bribe payment, funded in part by monies supplied by the Defendant, was made to the head of prisons by an individual who worked for Ivan, Alfredo, Ovidio, and Joaquin. In exchange for this payment, the Defendant understood that Guzman would receive favorable conditions within the prison. The Defendant understood that an escape from Juarez was not feasible and that, unless Guzman were eventually transferred back to Altiplano, the Defendant and others could not realistically plan for Guzman to escape from prison.

25. Guzman was never transferred back to Altiplano, and, on January 19, 2017, Guzman was extradited to the United States to face criminal charges.

26. The Defendant agrees that by providing assistance to Guzman, she aided and abetted the objectives of the DTO as a whole. The Defendant agrees that, in doing so, the Defendant facilitated the importation of various controlled substances including cocaine, heroin, methamphetamine, and marijuana into the United States. The Defendant admits that the total amount of cocaine involved in this conspiracy that is directly attributable to her because of her own conduct and/or because of the conduct of other conspirators reasonably foreseeable to her was well over four hundred and fifty (450) kilograms or more.

27. The Defendant admits that she knew the cocaine would be illegally imported into the United States for further distribution.

28. The Defendant admits that the total amount of heroin involved in this conspiracy that is directly attributable to her because of her own conduct and/or because of the conduct of other conspirators reasonably foreseeable to her was well over ninety (90) kilograms or more.

29. The Defendant admits that she knew the heroin would be illegally imported into the United States for further distribution.

30. The Defendant admits that the total amount of methamphetamine involved in this conspiracy that is directly attributable to her because of her own conduct and/or because of the conduct of other conspirators reasonably foreseeable to her was well over forty five (45) kilograms or more.

31. The Defendant admits that she knew the methamphetamine would be illegally imported into the United States for further distribution.

32. The Defendant admits that the total amount of marijuana involved in this conspiracy that is directly attributable to her because of her own conduct and/or because of the conduct of other conspirators reasonably foreseeable to her was well over ninety thousand (90,000) kilograms or more.

33. The Defendant admits that she knew the marijuana would be illegally imported into the United States for further distribution.

34. This Statement of Facts does not purport to include all of the Defendant's illegal conduct during the course of her charged offenses. It represents sufficient information for a Court to find a factual basis for accepting a guilty plea from the Defendant for the offenses outlined in paragraphs two, three, and four, above and alleged in Counts One, Two, and Three of the

Information. This Statement of Facts is not intended to represent all of the Defendant's relevant conduct. The limited purpose of this Statement of Facts is to demonstrate that there exists a sufficient legal basis for the Defendant to be convicted of the offenses outlined in paragraphs two, three, and four, above and as alleged in Counts One, Two, and Three of the Information, and the Defendant agrees that the above-outlined facts satisfy each of the essential elements of the criminal charges discussed in paragraphs two, three, and four, above and as alleged in Counts One, Two, and Three of the Information. The Defendant acknowledges that there are additional details about her involvement in the criminal activity discussed in paragraphs two, three, and four, above and as alleged in Counts One, Two, and Three of the Information, not included in this Statement of Facts.

35. The Defendant understands that venue may not exist in the District of Columbia for all the charges contained in this Statement of Facts, but agrees herein to waive any challenges — now and in the future — to venue and jurisdiction, and instead agrees that venue and jurisdiction for all criminal conduct referenced in the Statement of Facts, pursuant to Title 18, United States Code, Section 3238, lies with the United States District Court for the District of Columbia.

36. With her signature below and that of her counsel, the Defendant agrees that she has fully adopted this Statement of Facts as her own statement. The Defendant is adopting this Statement of Facts because it is a true and correct summary of the Defendant's own conduct.

\\
\\
\\
\\
\\
\\

\\

37.     The Defendant also agrees that the above-described acts were in all respects knowing, intentional, and willful, reflecting an intention and deliberation to do something the law forbids, and were not in any way the product of any accident, mistake of law or fact, duress, entrapment, or public authority.

>ARTHUR G. WYATT
>CHIEF, NARCOTIC & DANGEROUS DRUG SECTION
>CRIMINAL DIVISION
>U.S. DEPARTMENT OF JUSTICE

Date: 6/10/21     By: _____
                      Anthony Nardozzi
                      Deputy Chief

## DEFENDANT'S ACCEPTANCE

I have read this Statement of Facts with the assistance of my legal counsel, Mariel Colon Miro, Esquire, who is fluent in both the English language and the Spanish language. Ms. Colon has fully interpreted this Statement of Facts from the English language to the Spanish language for me. Furthermore, I have discussed this Statement of Facts at length with my attorneys, Mr. Jeffrey Lichtman, Esquire, and Ms. Colon. I fully understand this Statement of Facts and agree to the information contained within without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of Facts fully. I am signing this Statement of Facts because the information contained within is true and correct. I am in fact guilty of the offenses identified in paragraphs two, three, and four of this Statement of Facts.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to sign this Statement of Facts. I am satisfied with the legal services provided by my attorneys in connection with my signing of this Statement of Facts and matters related to it.

_____    6-10-21
Emma Coronel Aispuro                Date
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I am the defendant's attorney. I have fully explained to the defendant, the defendant's rights and the applicable provisions of the Sentencing Guidelines associated with the criminal charges identified in paragraphs two, three, and four of this Statement of Facts. I have carefully reviewed every part of this Statement of Facts with the defendant. The defendant is signing this Statement of Facts voluntarily, intelligently and with full knowledge of all consequences of the defendant's admissions contained herein.

_____    6-10-21
Jeffrey Lichtman, Esq.              Date
Attorney for Defendant

_____    6-10-21
Mariel Colon Miro, Esq.             Date
Attorney for Defendant