UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EMMA CORONEL AISPURO,<br><br>Defendant. | Case No. 21-CR-00255 (RC) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States, by and through the undersigned attorneys, respectfully submits this Sentencing Memorandum in advance of the sentencing of Defendant Emma Coronel Aispuro (hereinafter, "Defendant"), which is scheduled for November 30, 2021. For the reasons set forth below, the Government respectfully recommends that the Court impose a sentence of confinement of 48 months, a sentence below the Guidelines range set forth in the Defendant's Pre-Sentence Report (hereinafter, "PSR"), followed by a mandatory five-year period of supervised release. The Government also respectfully requests that the Court note the entry of a money judgment in the amount of $1,499,970.00 and include the Consent Order of Forfeiture in the Judgment as part of the Defendant's sentence, as set forth in Federal Rule of Criminal Procedure 32.2(b)(1)(4)(B). In support of this recommendation, the Government states the following:

I.    <u>Background</u>

    a.    <u>Procedural History</u>

On February 17, 2021, the Defendant was charged pursuant to a sealed Complaint alleging that she committed the offense of conspiracy to distribute more than one kilogram of heroin, more than five kilograms of cocaine, more than 500 grams of methamphetamine, and more than 1,000

1

kilograms of marijuana with the intent, knowledge, and reason to believe that such substances would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963.  Docket Number (hereinafter, "Dkt. No.") 1.  On February 22, 2021, the Defendant was arrested at Dulles International Airport in Dulles, Virginia, pursuant to an arrest warrant issued in conjunction with that Complaint.  Dkt. No. 12.

On June 10, 2021, the Defendant pleaded guilty pursuant to a plea agreement to a three-count Information (hereinafter, "the Information") charging her with conspiring to distribute five kilograms or more of cocaine, one kilogram or more of heroin, 500 grams or more of methamphetamine, and 1,000 kilograms or more of marijuana, knowing, intending, and having a reasonable cause to believe that such substance would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963 and 18 U.S.C. § 2 (Count One); conspiring to launder the proceeds of the narcotics offense charged in Count One, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h) (Count Two); and engaging in transactions and dealings in property and interests in property of a foreign person designated a Significant Foreign Narcotics Trafficker, in violation of 21 U.S.C. § 1903(b), and engaging in transactions and dealings to evade and avoid, and that had the effect of evading and avoiding, the prohibition on transactions and dealings in property and interests in property of said foreign person, in violation of 21 U.S.C. §§ 1904(c)(1), 1904(c)(2), and 1906(a) (Count Three).  Dkt. No. 20, 26, 31; PSR ¶¶ 1, 4.  The Information also contained a drug forfeiture allegation in which the Government gave Defendant notice that it would seek forfeiture of the proceeds of Count One attributable to Defendant.  Dkt. No. 20; PSR ¶ 2.

b. The Offense Conduct[1]

Beginning in or about 2011 and continuing to at least January 19, 2017, the Defendant was a co-conspirator in the activities of the drug trafficking organization ("DTO") known as the Sinaloa Cartel. In 2007, the Defendant married Joaquin Guzman Loera, also known as "El Chapo" (hereinafter, "Guzman") who was, at that time, a principal leader of the DTO along with his partner, Ismael Zambada Garcia, also known as, "El Mayo."[2]

From the time that the Defendant married Guzman in 2007 until the date of her arrest, on February 22, 2021, the Defendant knowingly benefitted from the proceeds of Guzman's drug trafficking activity in multiple ways.[3] The Defendant received direct monetary support from Guzman. Further, the Defendant lived in, possessed, and controlled residences paid for by Guzman's drug trafficking proceeds which included both residential properties and commercial properties. The Defendant derived income from renting the residential and commercial properties purchased by Guzman's drug proceeds. Accordingly, the Defendant maintained possession and control of a variety of properties in which Guzman has an interest from in or about 2007 until the date of her arrest on February 22, 2021.

On February 22, 2014, Guzman was arrested in Mazatlán, Sinaloa, Mexico by Mexican law enforcement officials. Following his arrest, Guzman was designated to Altiplano prison

---

[1] The following factual proffer relies on information derived from debriefings of cooperating witnesses, intercepted communications, additional records recovered during the investigation, and the Statement of Facts, Dkt. No. 27.

[2] On June 1, 2001, Guzman was identified by the President of the United States as a Significant Foreign Narcotics Trafficker under 21 U.S.C. § 1903(b) and 1907(7). As a result of Guzman's designation as a Significant Foreign Narcotics Trafficker, Guzman's assets, including property and interests in property within the possession or control of any "United States Person," as defined by 21 U.S.C. § 1907(6), are blocked pursuant to 21 U.S.C. § 1904(b).

[3] The Defendant is a United States citizen and, accordingly, is a "United States Person" as defined by 21 U.S.C. § 1907(6).

3

(hereinafter "Altiplano") located in Mexico State. Shortly thereafter, the United States Government formally requested that Guzman be extradited from Mexico to the United States. Following Guzman's incarceration, the Defendant visited Guzman in Altiplano. Guzman utilized the Defendant as a messenger to deliver messages to members of his DTO. Included in the messages passed by Guzman to other DTO leaders, via the Defendant as a courier, were messages related to drug debt collection, movement of drugs and weapons, and acts of violence. The messages delivered by the Defendant allowed Guzman to maintain control and order over his DTO despite the fact that he was in prison. In this regard, the messages passed by the Defendant on Guzman's behalf allowed the DTO to continue to import controlled substances, including cocaine, heroin, methamphetamine, and marijuana, into the United States.

When the Defendant visited Guzman in Altiplano, Guzman instructed the Defendant that he wanted her to organize an escape from Altiplano via an underground tunnel. To finance and plan for the escape from Altiplano, Guzman instructed the Defendant to communicate with other members of the DTO. The Defendant followed Guzman's orders and met with other co-conspirators in an effort to plan an escape from Altiplano via an underground tunnel. In doing so, the Defendant attempted to aid and abet the goals of the DTO of which Guzman was a leader; specifically, the importation of controlled substances including cocaine, heroin, methamphetamine, and marijuana, into the United States and the return of the proceeds from the sale of those controlled substances to the DTO.

In furtherance of the plan to help Guzman escape from prison, the Defendant retrieved money from another member of the conspiracy who possessed bulk cash totaling approximately $1 million which the Defendant knew was derived from drug trafficking activities. The Defendant delivered portions of that bulk cash to Altiplano prison personnel through intermediaries in an

effort to arrange for favorable prison conditions, including providing food not available to other inmates at the facility, to Guzman and to facilitate Guzman's escape from Altiplano. Under this arrangement, and in an effort to assist with Guzman's escape, the Defendant arranged for a GPS watch disguised as a food item to be delivered to Guzman by a prison guard. The GPS watch was delivered to Guzman approximately six months after tunnel construction began. The GPS watch was used to mark the location of Guzman's cell within Altiplano so that the tunnel engineers would know toward which specific geographic coordinates to construct the underground tunnel.

The Defendant met with another individual to arrange for the purchase of real property in close proximity to Altiplano prison so that a tunnel connecting the property to Altiplano prison to the proposed real property acquisition could be constructed. As tunnel construction began, the Defendant continued visiting Guzman in Altiplano prison to keep him apprised of the progress of construction.

Tunnel engineers were able to construct the tunnel entry directly underneath Guzman's cell at Altiplano with an entryway placed underneath the shower in his cell. On July 11, 2015, Guzman escaped from Altiplano maximum security prison via the underground tunnel. Thereafter, Guzman relocated to a mountain location within the Mexican state of Durango. The Defendant reunited with Guzman upon his arrival in Durango.

While he was a fugitive, Guzman maintained his leadership role in the Sinaloa Cartel and continued his drug trafficking activities. Guzman remained a fugitive until he was arrested on January 8, 2016 in Los Mochis, Sinaloa, Mexico, by Mexican law enforcement officials. Upon his arrest, Guzman was again designated to Altiplano prison in Mexico State. Again, the United States Government formally requested that Guzman be extradited from Mexico to the United States.

Approximately one month after Guzman's second placement in Altiplano, the Defendant went to Altiplano to meet with him. Guzman informed the Defendant that he wanted her to, again, help facilitate an escape by constructing another tunnel to Altiplano. Following her meeting with Guzman at Altiplano, the Defendant communicated with fellow co-conspirators to discuss Guzman's order.

The Defendant delivered bulk cash in an amount close to, but not exceeding $1 million in an effort to again arrange for favorable prison conditions for Guzman and to potentially facilitate another escape from Altiplano. Guzman was transferred to a different prison facility in Ciudad Juarez, Chihuahua, Mexico (hereinafter "Juarez") in May 2016 which made an escape from the new confinement location less feasible than an escape from Altiplano. The Defendant communicated with a co-conspirator about Guzman's movement to Juarez and discussed whether Guzman would be transferred back to Altiplano so that efforts to help Guzman escape from Altiplano could continue. The Defendant was aware that a $2 million bribe payment, funded in part by monies supplied by the Defendant, was made to a high level prison official in an effort to ensure that Guzman would receive favorable conditions within the prison. The Defendant understood that an escape from Juarez was not feasible and that, unless Guzman was eventually transferred back to Altiplano, the Defendant and others could not realistically plan for Guzman to escape from prison. Guzman was never transferred back to Altiplano, and, on January 19, 2017, Guzman was extradited to the United States to face criminal charges.

c.  Objections to the Presentence Investigation Report

On August 31, 2021, the Probation Office issued a final PSR for the Defendant. The PSR concluded that the Defendant's applicable Guidelines range in this case was 135 months to 168 months of confinement, based on an Offense Level 33 and a Criminal History I. PSR ¶ 66. At the time of the issuance of the PSR, neither the Government nor the Defendant objected to this Guidelines calculation. However, for the following reasons, the Government now objects and submits that Defendant's applicable Guidelines range is 57 to 71 months in prison based on an Offense Level 25 and a Criminal History I. Defendant and the Probation Office concur.

The Probation Office had determined that Defendant's Base Offense Level was 38, based on an offense involving 450 kilograms or more of cocaine, 90 kilograms or more of heroin, 45 kilograms or more of methamphetamine, and 90,000 kilograms or more of marijuana, pursuant to U.S.S.G. §§ 2D1.1(a)(5), (c)(1). PSR ¶ 57. The Probation Office further determined that Defendant's offense level should be increased by two levels based on the Defendant's conviction of an offence under 18 USC § 1956 in Count Two of the information, pursuant to U.S.S.G. § 2S1.1(b)(2)(B). PSR ¶ 58. The Probation Office also determined that the Guidelines range should be reduced by four levels as a result of the Defendant's role as a minimal participant in the criminal activity described in the plea agreement, pursuant to U.S.S.G. § 3B1.2(a). PSR ¶ 60. The Probation Office also noted that the Defendant demonstrated acceptance of responsibility for the charged offenses and assisted authorities in the investigation and prosecution of the Defendant's own misconduct. Therefore, the Probation Office correctly decreased the offense level by two levels. PSR ¶ 64. The Probation Office noted, and the Government now moves, for an additional one-level reduction for the Defendant's timely acceptance of responsibility under U.S.S.G. § 3E1.1. PSR ¶ 65.

The Probation Office did not address whether the Defendant met the criteria for application of the safety valve reduction under 18 U.S.C. § 3553(f) and U.S.S.G. § 2D1.1(b)(17), which would result in an additional two-level reduction. The Defendant will move for a two-level reduction for safety valve under 18 U.S.C. § 3553(f) and U.S.S.G. § 2D1.1(b)(17). The Government does not dispute the applicability of the two-level safety valve reduction.

While the Government agrees with the Probation Office's assessment of the various adjustments described above, upon further consideration, and in consultation with the Probation Office, both parties believe that an adjustment must be made to the Probation Office's original calculation of Defendant's Base Offense Level as 38. PSR ¶ 57. Upon a more detailed review of U.S.S.G. § 2D1.1(a)(5)(iii), where, as here, the application of U.S.S.G.§ 2D1.1(c)(1) results in a base offense level of 38 because of the quantity of drugs attributable to the defendant, *and* the defendant receives a full four-point reduction for minimal role pursuant to U.S.S.G. § 3B1.2(a), *and* the resulting offense level is still greater than 32, the Base Offense Level must be reduced to 32 prior to any upward and/or downward adjustments.[4] Thus, noting the revised Base Offense Level of 32, rather than 38, and applying the aforementioned Guideline adjustments for the money laundering conviction, minimal role, acceptance of responsibility, and the safety-valve reduction, the Government concludes that the appropriate Guidelines range in this case is 57 to 71 months of confinement, based on an Offense Level 25 and Criminal History I).

---

[4] Here, the drug quantity results in a Base Offense Level of 38, pursuant to U.S.S.G. § 2D1.1(a)(5), which is then reduced by four points because Defendant receives a mitigating role adjustment, pursuant to U.S.S.G. § 2D1.1(a)(5), which results in a Base Offense Level of 34. Because that resulting offense level of 34 is greater than 32 *and* Defendant receives a four-point reduction pursuant to U.S.S.G. § 3B1.2(a) (as opposed to a two-point or three-point reduction), the Base Offense Level is further reduced to 32, pursuant to the last sentence of U.S.S.G. § 2D1.1(a)(5).

## II. Sentencing Factors Pursuant to 18 U.S.C. § 3553(a)

The Sentencing Guidelines are advisory, not mandatory. *United States v. Booker*, 543 U.S. 220, 258-60 (2005). However, the Supreme Court held in *Booker* that sentencing courts must consider the Guidelines in formulating an appropriate sentence. *Id.* In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of *Booker*:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

*Gall*, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." *Id.* at 49-50 (citation and footnote omitted).

In determining the appropriate sentence, the statute directs Courts to consider "the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Further, Courts are also directed to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

9

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

III.   Application of the Sentencing Factors

For the reasons that follow, the Government respectfully recommends a sentence of 48 months, nine months below the low end of the applicable Guidelines range, followed by a mandatory period of supervised release of five years.

a.   Nature, Circumstance, and Seriousness of the Offense

The Defendant committed a serious crime against the United States, having admitted in her plea to conspiring to distribute 450 kilograms or more of cocaine, 90 kilograms or more of heroin, 45 kilograms or more of methamphetamine, and 90,000 kilograms or more of marijuana that she knew would be imported into the United States. In furtherance of that conspiracy, the Defendant

aided and abetted the drug trafficking activities of the Sinaloa Cartel by supporting the organization's primary leader, her husband, Guzman. The Defendant engaged in financial transactions, including the movement of bulk cash that she knew was derived from the drug conspiracy for a criminal purpose, to achieve those ends. In addition, the Defendant maintained possession and control of a variety of properties in which Guzman has or had an interest from in or about 2007 until at least February 22, 2021. As a United States Person, the Defendant was unable to maintain possession and control of those properties based upon the fact that Guzman was identified by the President of the United States as a Significant Foreign Narcotics Trafficker on June 1, 2001. Any sentence imposed must reflect the seriousness of this criminal conduct.

  b. <u>History and Characteristics of the Defendant</u>

  The Government agrees with the PSR regarding nearly all of the Defendant's history and characteristics. PSR ¶¶ 67-88. As it relates to the PSR discussion of the Defendant's assets in paragraph 89, the Government will discuss, in greater detail *infra*, the Defendant's agreed upon and executed forfeiture of assets.

  c. <u>Adequate Deterrence</u>

  Given the adverse impact that drug trafficking has on society and the serious detrimental effects of cocaine, heroin, methamphetamine, and marijuana in communities, it is important that the Court impose a sentence that deters others from undermining the rule of law. However, the Court should also balance the deterrence factor against the Defendant's role and the Defendant's swift acceptance of responsibility in this matter.

  d. <u>Protect the Public from Further Crimes of the Defendant</u>

  The Defendant does not have a criminal history beyond the instant offenses and swiftly accepted responsibility for her actions in the instant matter. Therefore, the Government believes

11

that a sentence of 48 months in prison followed by a mandatory five-year period of supervised release is appropriate to protect the public from future crimes of the Defendant.

  e. <u>Need for Sentence Imposed to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants</u>

Section 3553(a)(6) articulates "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). When determining whether a sentence creates an unwarranted disparity, the Court should consider a defendant's acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, a defendant's criminal history, and whether and to what extent a defendant cooperated. *See, e.g.*, *United States v. Mejia*, 597 F. 3d 1329, 1344 (D.C. Cir. 2010).

As set forth above, the Defendant engaged in drug-trafficking and money-laundering activities on behalf of the Sinaloa Cartel and also committed a criminal violation of the Kingpin Act. In arriving at its sentencing recommendation, the Government has evaluated the Defendant's role within the conspiracy, the length and extent of her criminal conduct, and her willingness to swiftly accept responsibility for her actions, as compared with co-conspirators, as well as other similarly situated defendants. Other international narcotics traffickers, who had similar criminal culpability and saved the Government valuable time and resources by quickly accepting responsibility, have received below-Guidelines sentences similar to the sentence recommended by the Government.

IV. <u>Forfeiture</u>

The Information contained a Criminal Forfeiture Allegation giving notice that the Government would seek forfeiture pursuant to 21 U.S.C. §§ 853 and 970 of any property constituting, or derived from, any proceeds of obtained by Defendant as a result of her commission

of Count One, and any property used to or intended to be used, in any manner or part, to commit or facilitate Count One.  In the plea agreement, the Defendant agreed to such forfeiture an to assist the Government in achieving such forfeiture.  *See* Dkt. No. 26 ¶ 5.

On November 18, 2021, the Government filed a Motion for Consent Order of Forfeiture requesting that the Court issue a Consent Order of Forfeiture pursuant to Federal Rule of Criminal Procedure 32.2(b)(1)(A) and (4)(A) entering a money judgment in the amount of $1,499,970.00 against the defendant.  Dkt. No. 38.  As described in the Motion for Consent Order of Forfeiture, although there are no specifically forfeitable assets in this case, the Government has requested and the Defendant has consented to the entry of a money judgment in the amount of $1,499,970.00, which represents the value of forfeitable property attributable to the Defendant that constitutes proceeds of Count One and property used to facilitate Count One, pursuant to 21 U.S.C. §§ 853(a) and 970.  *See* Fed. R. Crim. P. 32.2(b)(1)(A) and (4)(A).  Defendant consented to the proposed Consent Order of Forfeiture attached to the Government's Motion.  *See* Dkt. No. 38 at 1. Defendant also has agreed to provide $1,499,970.00 to the Government prior to sentencing in satisfaction of the anticipated money judgment and Consent Order of Forfeiture.

Accordingly, the Government respectfully requests that the Court enter the Consent Order of Forfeiture prior to or at sentencing and, thereafter, note and include the money judgment in the amount of $1,499,970.00 and Consent Order of Forfeiture in the Judgment pursuant to Federal Rule of Criminal Procedure 32.2(4)(A) and (B).

V.     Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 48 months followed by a five-year period of supervised release, which is a sentence appropriate to achieve the purposes set forth in 18 U.S.C. § 3553(a).  The Government also

respectfully requests that the Court note the entry of a money judgment in the amount of $1,499,970.00 and include the Consent Order of Forfeiture in the Judgment as part of the Defendant's sentence, as set forth in Federal Rule of Criminal Procedure 32.2(b)(1)(4)(B).

        Respectfully submitted,
        ARTHUR G. WYATT
        Chief
        Narcotic and Dangerous Drug Section
        U.S. Department of Justice
        Washington, D.C. 20530

By:    */s/ Anthony J. Nardozzi*
        Anthony J. Nardozzi, Deputy Chief
        Katharine A. Wagner, Assistant Deputy Chief
        Narcotic and Dangerous Drug Section
        Criminal Division
        U.S. Department of Justice
        Washington, D.C.  20530
        Telephone: (202) 514-0651

**CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing Government's Sentencing Memorandum foregoing was filed through the Electronic Court Filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

      By:    */s/ Anthony J. Nardozzi*
                Anthony J. Nardozzi
                Deputy Chief
                Narcotic and Dangerous Drug Section
                Criminal Division
                U.S. Department of Justice