```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2              - - - - - - - - - - - - - - - x
        THE UNITED STATES OF AMERICA,
 3                                        Criminal Action No.
                        Plaintiff,        1:21-cr-00255-RC-1
 4                                        Tuesday, November 30, 2021
        vs.                               12:05 p.m.
 5
        EMMA CORONEL AISPURO,
 6
                        Defendant.
 7       - - - - - - - - - - - - - - - x
 8       _____

                    TRANSCRIPT OF SENTENCING HEARING
 9           HELD BEFORE THE HONORABLE RUDOLPH CONTRERAS
                    UNITED STATES DISTRICT JUDGE
10       _____
        APPEARANCES:
11      For the United States:      ANTHONY JOHN NARDOZZI, ESQ.
                                    KATHARINE ANN WAGNER, ESQ.
12                                  U.S. DEPARTMENT OF JUSTICE
                                    145 N Street, NE
13                                  Washington, DC 20530
                                    (202) 598-6481
14
        For the Defendant:          JEFFREY LICHTMAN, ESQ.
15                                  LAW OFFICES OF JEFFREY LICHTMAN
                                    11 East 44th Street
16                                  New York, NY 10017
                                    (212) 581-1001
17
                                    MARIEL COLON MIRO, ESQ.
18                                  LAW OFFICES OF MARIEL COLON
                                    MIRO, PLLC
19                                  300 Cadman Plaza W 12th Floor
                                    Brooklyn, NY 11201
20                                  (917) 743-7071

21      Interpreter:                Teresa Salazar
                                    Teresa Roman
22
        Court Reporter:             Lisa A. Moreira, RDR, CRR
23                                  Official Court Reporter
                                    U.S. Courthouse, Room 6718
24                                  333 Constitution Avenue, NW
                                    Washington, DC  20001
25                                  202-354-3187
```

```
1                   P R O C E E D I N G S
2            THE COURTROOM DEPUTY:  This is Criminal Action
3    21-255, United States vs. Emma Coronel Aispuro.
4            For the United States, I have Anthony Nardozzi and
5    Kate Wagner.
6            For Emma Aispuro, I have Jeffrey Lichtman and
7    Mariel Colon Miro.
8            Our probation officer today is Sherry Baker, and
9    our court reporter is Lisa Moreira.  All parties are
10   present.
11           THE COURT:  All right.  Are we ready to get
12   started?
13           MR. LICHTMAN:  Yes, Your Honor.
14           MR. NARDOZZI:  Yes, Your Honor.
15           THE COURT:  Okay.  Ms. Aispuro and counsel, have
16   you reviewed the amended presentence report as revised
17   following the defense's and the government's submissions?
18           MR. LICHTMAN:  Yes, Your Honor, we have.
19           MR. NARDOZZI:  Yes, Your Honor.
20           THE COURT:  And any additional objections?
21           MR. LICHTMAN:  No.  They're all accounted for.
22           MR. NARDOZZI:  Same for the government, Your
23   Honor.
24           THE COURT:  Okay.  So under Federal Rule of
25   Criminal Procedure 32(i)(3)(A), the Court will accept the
```

1    presentence report as its findings of fact of issues not in

2    dispute.

3         This case falls within the Sentencing Reform Act

4    of 1984 in which Congress created the United States

5    Sentencing Commission which has issued detailed guidelines

6    for judges, such as myself, to consider in determining the

7    sentence in a criminal case like this.  The Commission has

8    set sentencing ranges for specific offenses, and those

9    ranges are contained in the guidelines manual.

10        However, in light of the Supreme Court's decision

11   in *Booker*, the guidelines are not mandatory.  They are

12   advisory but in the typical case must be consulted by the

13   Court in determining the appropriate sentence.  Therefore,

14   under those procedures, a Court assesses and determines the

15   proper sentence by reference to and in consideration of the

16   guidelines in the first instance, but the guidelines are

17   treated as advisory, not mandatory, and there's no

18   presumption that the guidelines sentence is the correct

19   sentence.  The guidelines are considered along with all the

20   other relevant factors under the sentencing statute 18 USC

21   3553(a).

22        The defendant has pled guilty to a three-count

23   information:  Count 1, conspiracy to distribute heroin,

24   cocaine, marijuana, and methamphetamines for unlawful

25   importation to the United States; Count 2, conspiracy to

1     launder money instruments; Count 3, engaging in transactions

2     and dealings in properties of a designated significant

3     foreign narcotics trafficker.

4             As reflected in the presentence report, in

5     particular the amended one, in the guidelines calculation

6     using the 2018 manual all counts are grouped because they

7     all involve the same victim, the United States, and two or

8     more acts of transactions connected by a criminal objective

9     or constituting part of a common scheme or plan.  Thus, the

10    offense level applicable for this group is that for the

11    highest offense level of the group.  Here that is the money

12    laundering count that applies, the underlying offense for

13    which the laundered funds are derived guidelines, which is

14    the conspiracy to distribute heroin, cocaine, marijuana, and

15    methamphetamines for unlawful importation count.

16            The parties have attributed the following weights

17    to the conspiracy:  cocaine, 450 kilograms; heroin, 90

18    kilograms; methamphetamine, 45 kilograms; marijuana, 90,000

19    kilograms, which results in a total converted drug weight of

20    360,000 kilograms.  That results in a base offense level of

21    38, but under the adjustment set forth in the presentence

22    report if the resulting offense level is greater than 32 and

23    the defendant receives the minimum participant four-level

24    reduction, which she does, the base offense level is reduced

25    to 32.

1          So starting with 32 as the base offense level,

2     there's a four-level downward adjustment for minimal

3     participant in criminal activity.  There's two additional

4     points because the defendant is convicted of 18 USC 1956,

5     which is the money laundering count, resulting in an

6     adjusted offense level of 30.

7          The defendant is also entitled to the safety valve

8     adjustment because she has met the criteria under 18 USC

9     3553(f) and the Sentencing Guidelines Section 5C1.2, thus

10    she is entitled to a further two-level reduction pursuant to

11    Sentencing Guideline 2D1.1(b)(18), which results in an

12    adjusted offense level of 28, and the safety valve

13    adjustment also gets her out from under the 10-year minimum.

14         Three levels of a downward adjustment for

15    acceptance of responsibility, two levels for clear

16    demonstration of acceptance of responsibility, and an

17    additional level on the government's motion, which I grant,

18    for assistance in investigation by timely provision of

19    information concerning her involvement and by timely

20    notification of intent to enter a guilty plea.  With that

21    three-level decrease it results in a total offense level of

22    25.

23         Defendant has no prior criminal convictions

24    resulting in no criminal history points, which puts her in

25    the Criminal History Category Roman numeral I.  The

1      guidelines range for imprisonment based on a total offense

2      level of 25 and a criminal history category of Roman numeral

3      I is 57 to 71 months.

4              Defense counsel, are there any objections to those

5      calculations?

6              MR. LICHTMAN:  No, Your Honor.

7              THE COURT:  Any from the government?

8              MR. NARDOZZI:  No, Your Honor.

9              THE COURT:  All right.  As I've said under the law

10     following *Booker*, the guidelines are advisory in this case,

11     but they're considered fully by the Court along with all the

12     other relevant factors under 3553(a) in determining the

13     proper sentence.

14              Would the government like to address the Court

15     regarding sentencing?

16              MR. NARDOZZI:  Yes, Your Honor.  Thank you.

17              First, Your Honor, regarding the offense itself,

18     I'd like to incorporate the sentencing memorandum --

19              THE COURT:  Can you go slow, Mr. Nardozzi, so the

20     court reporter can keep up.

21              MR. NARDOZZI:  Sure.  I'd like to incorporate the

22     sentencing memorandum as well as the statement of facts that

23     was previously filed --

24              THE COURT:  Of course.

25              MR. NARDOZZI:  -- before the Court at the time of

1   the guilty plea.

2          Your Honor, as outlined in the papers filed with

3   the Court, the defendant's conduct was carried out in

4   support of her husband, Joaquin Guzman Loera, also known as

5   El Chapo, and the drug trafficking organization that he

6   helped to lead, which we know is the Sinaloa Cartel.  Most

7   notably, after Guzman was arrested in Mexico in February

8   2014, the defendant communicated messages from him while he

9   was in custody.  Many of those messages were in the form of

10  letters, letters in which Guzman painstakingly directed his

11  subordinates to collect drug debts, to move drugs and

12  weapons, and to carry out other acts to advance the aims of

13  the Sinaloa Cartel.  Thanks to the defendant's assistance in

14  this regard, Guzman was able to maintain his leadership

15  position in the cartel even while incarcerated in a Mexican

16  prison.

17          At Guzman's direction, the defendant worked with

18  others within the cartel, including Guzman's sons, to help

19  plan Guzman's eventual escape from prison via an underground

20  tunnel.  The defendant moved drug proceeds in the form of

21  bulk cash to help finance tunnel construction and she

22  arranged for a GPS watch disguised as a food item to be

23  delivered to Guzman while he was in custody via a prison

24  guard.  That GPS watch was used to mark the location of

25  Guzman's cell within the prison so that the tunnel engineers

1    would know where to design the tunnel to end.  This was a

2    significant architectural and engineering feat, and it

3    required many, many moving parts and a lot of work.

4         And all of these efforts did work.  Guzman

5    eventually escaped from a Mexican prison in July 2015 via

6    the underground tunnel that the defendant worked with others

7    to construct, and he resumed his activities as the leader of

8    the Sinaloa Cartel.  These efforts and the other efforts

9    described in more detail in the sentencing papers were

10   carried out by the defendant in support of and based upon

11   the orders of Guzman.

12        The overall effect of the defendant's criminal

13   conduct was significant, particularly as it related to the

14   infamous prison escape.  Additionally, the messages she

15   passed on on Guzman's behalf to his subordinates furthered

16   the criminal objectives of the Sinaloa Cartel, and for these

17   reasons a sentence of incarceration is both appropriate and

18   necessary.

19        In rendering sentencing recommendations, Your

20   Honor, the government also has to balance factors that are

21   unique to each defendant vis-a-vis his or her criminal

22   conduct.  In light of the conduct I've just described and

23   the conduct laid out in the sentencing papers, the

24   government is recommending a sentence of 48 months today.

25   This would constitute a downward variance of nine months

1    from the low end of the guidelines range that the Court just

2    described, and in doing so the government considered a

3    number of factors, which I'll lay out.

4            First, as reflected in the guidelines

5    recommendation, while the overall effect of the defendant's

6    conduct was significant, the defendant's actual role was a

7    minimal one.  The defendant acted primarily in support of

8    her husband.  The defendant acted upon his orders, which, in

9    turn, furthered the interest of the Sinaloa Cartel.  The

10   defendant was not a leader, organizer, boss, or other type

11   of a manager.  Rather, she was a cog in a very large wheel

12   of a very powerful criminal organization and her primary

13   significance on a criminal level was her proximity to that

14   organization's leader.  This combined with the defendant's

15   lack of a prior criminal record were considerations for the

16   government in rendering its recommendations today.

17           Second, after the defendant's arrest earlier this

18   year in February, the defendant quickly accepted

19   responsibility for her criminal conduct.

20           Procedurally, the defendant was arrested on a

21   warrant pursuant to a criminal complaint.  Defendants that

22   are arrested on a warrant pursuant to a criminal complaint

23   have a right to either proceed to a preliminary hearing or

24   to have the government indict them.  This defendant waived

25   those rights as well as her right to a trial by jury, and

1   she did so quickly.  She entered a guilty plea to an

2   information in June of this year.  In doing so, the

3   defendant saved the government the considerable time and

4   resources that would have been required to engage in

5   adversarial proceedings against her.

6        The defendant was certainly familiar with some of

7   the evidence that the government was prepared to use at

8   trial against her.  This defendant attended each day of the

9   trial that her husband took part in in 2018 to 2019, and she

10  was present as portions of the evidence presented against

11  her husband that also would have implicated her were

12  presented in court.  Knowing this, the defendant opted to

13  take accountability for her actions, and she did so quickly

14  before we had to expend resources to prepare for so much as

15  a preliminary hearing or a grand jury presentment let alone

16  a jury trial.  And the government took that into

17  consideration in making its recommendation as well.

18        Third, the defendant has agreed to voluntarily

19  forfeit the remaining proceeds of her criminal activity to

20  the government in the form of just under $1.5 million, and,

21  Your Honor, the government presented a motion of forfeiture

22  order to you as well, and we'd ask you to sign it today.

23        THE COURT:  I will sign it.  One question I had

24  about that was that the papers indicate that that was to be

25  paid before the sentencing.  Has that occurred?

1     MR. NARDOZZI:  It has, Your Honor.

2     THE COURT:  Okay.

3     MR. NARDOZZI:  Yes.  The amount of forfeiture,

4 Your Honor, from the government's perspective is not

5 significant.  It's -- what is significant is the defendant's

6 agreement in subsequent surrender of funds.  The government

7 views that as a reflection of the defendant's willingness to

8 accept responsibility and to be accountable for her actions.

9     Finally, Your Honor, the defendant, as the Court

10 acknowledged, has moved for a safety valve reduction.  This

11 is a common sentencing consideration to which the government

12 does not object based upon the defendant's criminal history,

13 which does not include any prior offenses, the defendant's

14 role in the offenses with which she's charged was not as a

15 leader or organizer, and the lack of violence carried out by

16 the defendant.

17     Finally, as the Court knows, the safety valve

18 provision requires that the defendant truthfully and fully

19 acknowledge his or her criminal conduct.  In return, a

20 defendant can seek a downward variance in the sentencing

21 guidelines as well as an opportunity to be sentenced below a

22 mandatory minimum here.  The defendant fully acknowledged

23 her criminal conduct and as a result meets all of the

24 criteria for the safety valve from the government's

25 perspective.

1          Based on all of those factors, Your Honor,

2    balancing the defendant's criminal conduct against her lack

3    of a criminal history, her swift and fulsome acceptance of

4    her responsibility for her actions, the government believes

5    that a sentence of incarceration is appropriate.  The

6    government's request for 48 months of incarceration imposes

7    a sentence that is sufficient but not greater than necessary

8    to reflect the seriousness of the offense, promote respect

9    for the law, and to provide just punishment for the

10   defendant's criminal conduct.

11          THE COURT:  All right.  I have a few questions for

12   you.

13          MR. NARDOZZI:  Yes, Your Honor.

14          THE COURT:  In your papers, there's a reference to

15   the time when Mr. Guzman was in the Altiplano Prison the

16   defendant conveyed messages on his behalf.  In the papers

17   there's a reference to some of those messages involving

18   violence.  You didn't address that today.  But for the

19   messages that she conveyed involving orders to commit acts

20   of violence, do you know -- does the government have any

21   information as to whether anyone was harmed as a result of

22   those orders?

23          MR. NARDOZZI:  Your Honor, the government doesn't

24   have any information regarding specific harm related to

25   those orders.  What I can tell the Court is that the

1    messages that were passed related to acts of violence were

2    passed in the form of letters that Guzman wrote to his

3    primary subordinate that worked directly underneath him.

4          It's not necessarily certain that the defendant

5    was necessarily privy to every part of the messages that

6    were passed to him.  She was simply a courier of those

7    messages from Guzman to his primary subordinate.

8          THE COURT:  Is it safe to assume, given the

9    structure of the organization, that -- and the resources

10   that Mr. Guzman had access to even while in prison, that if

11   the defendant had not couriered those orders someone else

12   would have?

13         MR. NARDOZZI:  Your Honor, that's a difficult

14   question to answer.  You know, this defendant maintained a

15   position of trust with Mr. Guzman.  She was his wife.  I

16   don't know -- I can't speak for what was in Mr. Guzman's

17   mind, but he chose her to move those messages to the people

18   that work for him.

19         THE COURT:  Okay.  Let me ask you, your papers

20   don't address a fine at all.  The presentence report has no

21   evidence of any assets in the defendant's name, but yet she

22   was able to get most of the resources to get $1.5 million

23   together.  Does the government have any position on

24   imposition of a fine?

25         MR. NARDOZZI:  Your Honor, we defer to the Court

1    on imposition of a fine.

2              THE COURT:  Okay.  Do you have any insight on an

3    ability to pay the fine beyond what's in the presentence

4    report?

5              MR. NARDOZZI:  Your Honor, based upon what's in

6    the presentence report combined with the fact that we were

7    able to have the defendant turn over $1.5 million to us, I

8    don't believe there is an ability to pay any fine.

9              THE COURT:  Okay.  And, you know, I've had now a

10   group of Sinaloa Cartel defendants, all of whose situations

11   are quite different than the defendant's, but do you want to

12   point me in the direction of any defendants that have either

13   been before me or elsewhere that you think might be apt

14   comparators for purposes of sentencing?

15             MR. NARDOZZI:  I do, Your Honor, but if we can

16   have a brief sidebar?

17                  (Pause)

18             THE COURT:  I don't know how we are physically

19   going to be able to do that.  I'll withdraw my question

20   then.  I've done my research on that.

21             All right.  And that's the only other question I

22   had.  Thank you, Mr. Nardozzi.

23             MR. NARDOZZI:  Thank you, Your Honor.

24             THE COURT:  Mr. Lichtman.

25             MR. LICHTMAN:  Thank you, Judge.  Do you want me

1    here?

2              THE COURT:  Over there.

3              MR. LICHTMAN:  Thank you, Judge.

4              Obviously the most important point that I think

5    that really jumps out from the story of Emma Coronel and her

6    role in this much larger conspiracy was that she met Joaquin

7    Guzman when she was a minor, when she was 17 years old, and

8    she married him on her 18th birthday.  And that was really,

9    as the government's acknowledged, her main role in all of

10   this, which began when she was a very impressionable minor

11   and married to a very powerful man more than three decades

12   older than her.

13             And as noted in the government's factual portion

14   of Ms. Coronel's role, her involvement in this multiyear

15   massive drug trafficking organization was in many ways just

16   being Joaquin Guzman's wife.  She lived in residences that

17   he purchased with drug proceeds, according to the

18   government.  She spent money that Mr. Guzman gave her and

19   that they used to live on all from proceeds of crime.

20             In addition, she assisted Mr. Guzman -- this is

21   the meat of it -- in his escape from the Altiplano Prison

22   after he was arrested in February of 2014.  She met with

23   individuals about the escape.  She passed messages, as we

24   know.  She passed proceeds to others to effectuate this

25   escape.  And in July of 2015 he did escape, was rearrested a

1   few months later in January of 2016, and sent to the Cuidad

2   Juarez Prison.  Ms. Coronel again attempted to help her

3   husband escape, but he was extradited to the United States

4   in January of 2017.  Emma was also aware that the drugs from

5   her husband's organization were flowing into America during

6   the time that she was involved in it.

7         For all of these reasons, all parties agree -- and

8   it's not always the most common thing, that all parties

9   agree; but we did here -- that Emma deserved the minimal

10   role downward adjustment, which made her guidelines 57 to

11   71.  And that's just the guidelines, and it's obviously a

12   catch-all for many defendants that fit into a 57-to-71-

13   month guideline range.

14         But the guidelines don't reflect the fact that she

15   became involved in this conspiracy after marrying Joaquin

16   Guzman on her 18th birthday.  She obviously was not an adult

17   and -- barely an adult, I suppose, and respectfully her

18   responsibility in this entire multiyear drug trafficking

19   organization should be judged through the lens of how she

20   entered it.  And I think that's really different from I

21   would say almost any defendant that Your Honor has had from

22   this or any other organization, to start as a minor in a

23   sense.  And I suspect it's for those reasons -- you know, we

24   don't get into it with the government, why they make their

25   sentencing recommendations, but I think that in part that

1       was the reason, perhaps, why -- I don't mean to speak for

2       them -- why their recommendation was a nine-month downward

3       variance from her sentencing guidelines.

4              But there's also more, Judge, that I have to bring

5       up that I believe is why she deserves less than not only the

6       57-to-71-month guideline range but also the 48-month

7       recommendation:  the danger that she finds herself in due to

8       the numerous unattributed and anonymous comments from

9       government agents claiming that she cooperated with the

10      government here.

11             On the day of her arrest an unnamed, quote,

12      federal law enforcement source told the *New York Post* as

13      well as a website that Ms. Coronel was cooperating with the

14      government, and these comments from unnamed federal sources

15      continued over the summer, this past summer.  And what it's

16      done is that it's made it so I don't know that she ever can

17      go back to her home again in Mexico based on the garbage

18      that was spread by these anonymous federal law enforcement

19      agents.

20             And I want to say this, Judge, and it's important.

21      I'm not castigating this prosecutor or this case agent.

22      and believe me, Judge, if I could, I would.  But I won't

23      because they had nothing to do with it.  I'm certain.  I've

24      known Mr. Nardozzi now for a few years from the El Chapo

25      Guzman case, and he's never been anything but completely

1    straight, completely honest; and same thing with the agent,

2    Mr. McGuire.  There's no question in my mind they had

3    nothing to do with this.

4         But they don't control the entire government; but

5    sadly the government is responsible for this.

6         So I'm not sure that she can ever go back to her

7    home.  I don't know that it won't always be a danger to her

8    because of that.

9         And the 57-to-71-month guideline range doesn't

10   reflect what was done to her.  Neither does the four-year

11   recommendation, respectfully.  How her life will be affected

12   forever upon her release from prison, she didn't bargain for

13   that in any plea agreement.

14        And imagine, Judge, the day that she's arrested in

15   February of this year finding herself in a prison cell in a

16   foreign country far away from home, and just hours after she

17   is arrested this is all over the press.  Her young children

18   are away from her.  She no longer has any control or the

19   ability to protect them.  That's how her first day in prison

20   started, Judge.  And I don't know if I've ever seen a

21   situation like that, the guilt and the fear that this

22   defendant was experiencing on that day.  Whatever she's done

23   or didn't do, Judge, she certainly didn't deserve that.

24        And in addition, back to the conditions of her

25   incarceration over the past nine months.  They've been

1    awful.  Partly because of COVID, which many defendants

2    appear before Your Honor and have had to deal with COVID

3    incarceration.  It's horrible.  They don't have visits from

4    their family and friends for a while.  There is none.  No

5    ability.

6         Well, she hasn't had a single visit from family

7    and friends in the nine months she's been in.  She doesn't

8    speak the language.  Her family is in Mexico unable to get

9    visas from this government, and she's been here alone for

10   nine months.  She's under lockdown 22 hours a day.  As I

11   said, she doesn't speak the language.  One of the two hours

12   that she's free for a large part of the incarceration was in

13   the middle of the night they let her out because they didn't

14   want to disturb the many other prisoners that were in her

15   unit.  So for months she had one free hour during the day,

16   one during the night, and that was all done for her supposed

17   safety, as we were told.  And these are awful conditions for

18   any defendant.  But especially for one who played a minimal

19   role in a conspiracy, it's especially egregious,

20   respectfully.

21         In addition, as Mr. Nardozzi said, the $1.5

22   million in forfeiture -- and I recognize that it's a drop in

23   the bucket of this drug organization, but it's not a drop in

24   the bucket to her.  It was everything that she could get her

25   hands on.  And I can tell you, Judge -- I've been doing this

1     for a lot of time -- I don't know many defendants that have

2     had a forfeiture, a voluntarily forfeiture.  Usually it's

3     when they freeze a bank account, and at that point they just

4     give up the right to the bank account.  To be able to

5     marshal these assets and get them to America during the

6     pendency of this case, I don't know that I've ever seen that

7     happen before.  So it is a big deal.

8          Obviously the instant acceptance of responsibility

9     when she was arrested saved the government a lot of time, a

10    lot of effort.  We know how much effort Guzmans can

11    occasionally cause the government.  In this case it was next

12    to nothing.  She immediately accepted responsibility and did

13    the right thing.  As Mr. Nardozzi said, she fulfilled all

14    the requirements of the safety valve where she spoke about

15    her own involvement.  That's what was required.  That's what

16    she did.  Here's where we are at the 57 to 71.

17         What's also not reflected in the guideline range

18    or the four-year recommendation is another 3553(a) factor,

19    which is her life history and the good things that she's

20    done, the humanitarian work, whether it was handing out

21    supplies for victims of an earthquake in Mexico in 2017 or

22    to low-income poor children, sick people.  She's always

23    tried to help others.

24         So after spending nine months in prison, Judge,

25    under the most horrific conditions, the stress, the guilt,

1     the pressure, thousands of miles away from her home and her

2     family in a foreign country, Emma at this point has one

3     thing on her mind.  And she'll speak to the Court, Judge,

4     and say she's obviously mortified about the situation.  She

5     knew what she was getting into, Judge, when she was at the

6     trial of her husband.  She heard that there was evidence

7     that implicated her, and nevertheless she still made trips

8     back and forth to America knowing full well that she could

9     be arrested.  She still did it.

10          But the one thing that she has on her mind besides

11    making amends for the foolish decisions that she made as a

12    young woman is that she wants to do better for her young

13    children and wants them to know that they should not make

14    the mistakes that she made.  She wants to be a good example

15    for them going forward.

16          And, Judge, for all those reasons, for all that

17    she's gone through in this experience with a husband who she

18    will never get to speak to again, never get to see her

19    children again, it's a difficult situation, as you can

20    imagine.  And Judge, for that I'm not going to ask for a

21    specific sentence, but I would ask for a sentence certainly

22    below the four years.  I think it's merited with all of

23    these factors put together, especially about the fact that

24    her role was primarily as a wife in this situation, and for

25    those reasons I would respectfully request a sentence that's

1     tempered with mercy.  Thank you, Your Honor.

2              THE COURT:  Okay.  You're welcome.  Thank you.

3     And you said the defendant does wish to address the Court?

4              MR. LICHTMAN:  She does, Your Honor.

5              THE COURT:  Okay.  Let's hear from her.

6              MR. LICHTMAN:  Thank you, Judge.

7              THE COURT:  Thank you.

8              THE DEFENDANT:  Good morning.

9              Your Honor, with all due respect, I address you

10    today to express my true regret for any and all harm that I

11    may have done, and I ask that you and all the citizens of

12    this country forgive me.  I am also a citizen of this

13    country, and for that reason I feel even more shame.

14             I know that you may find it difficult to ignore

15    the fact that I am the wife of Mr. Guzman Loera, and perhaps

16    for this reason you feel that there is need for you to be

17    harder on me.  I pray that you not do that.

18             I am suffering as a result of the pain that I've

19    caused my family by finding myself in the current situation.

20    My family brought me up to know what respect was, gratitude,

21    and honesty, but they also taught me to accept those

22    mistakes that I made.  And for that reason, I am here before

23    you asking for forgiveness.

24             And those are precisely the same values that I

25    wish to teach my daughters.  They are the primary and the

1    most important reason why I am here before you, and I accept

2    the mistakes that I have made, and I am sorry for them.

3          They were already growing up without the presence

4    of one of their parents, and for this reason I beg you to

5    please not allow them to grow up without the presence of

6    their mother.  And I do appreciate the time that you have

7    given me and to listen to me.  Emma Coronel Aispuro.

8          THE COURT:  Thank you.

9          All right.  We'll get started with the financial

10   issues.  There's no restitution at issue given the nature of

11   the charges.

12          With respect to a fine, the maximum fine under the

13   statute is $10 million.  The guidelines range is $35,000 to

14   $10 million.  I don't intend to impose a fine because the

15   presentence report reflects no information supporting an

16   ability to pay one, and I would be speculating otherwise.  I

17   have no evidence before me that she has an ability to pay a

18   fine.

19          The forfeiture count, there's a consent money

20   judgment in an amount just short of $1.5 million.  I've

21   signed that order, and that will be entered on the docket.

22   My understanding from Mr. Nardozzi's representations is that

23   that amount has already been paid.

24          The Court is to assess the sentencing factors

25   under the sentencing statute, which is 18 USC 3553(a).  The

1    Court is to impose a sentence sufficient but not greater

2    than necessary to comply with the purposes set forth in the

3    subsection.  I've considered the nature and circumstances of

4    the offense and the history and characteristics of the

5    defendant, and I am to impose a sentence that reflects the

6    seriousness of the offense, promotes respect for the law,

7    and provides just punishment for the offense.

8          The offense is a serious one involving

9    participation in the activities of a large-scale Mexican

10   drug cartel whose importation of narcotics to this country

11   poisons its population.  In particular, defendant

12   participated in a conspiracy involving the Sinaloa Cartel of

13   Mexico.  It is reputed to be one of the world's most

14   powerful and violent drug cartels which is responsible for

15   the distribution of multiton quantities of cocaine and other

16   drugs into the United States.

17         Her role, however, in that organization was

18   primarily that of being the wife of one of the leaders of

19   the organization, Joaquin El Chapo Guzman.  Her

20   participation in the conspiracy was largely that of a

21   supportive wife who passed along messages and orders and

22   arranged for bribes and made other arrangements to improve

23   her husband's conditions of confinement, but, of course, she

24   also enjoyed the use of and helped manage some of the

25   proceeds of the drug trafficking enterprise.

1            Importantly, she played an important role in

2      Guzman's escape from the Altiplano Prison.  In particular,

3      when defendant visited Guzman in this prison, he used her as

4      a messenger to convey directions to members of the

5      organization allowing him to maintain control and order over

6      the organization despite his imprisonment.  Guzman also

7      instructed her to facilitate an escape plan utilizing an

8      underground tunnel.

9            In that role, the defendant communicated with

10     other members of the organization, including Guzman's four

11     sons, to facilitate the acquisition of land near the prison

12     for the tunnel, the construction of the tunnel, and the

13     financing of the operation through the use of the

14     organization's drug proceeds.

15           She also used such proceeds to bribe prison

16     personnel to improve his prison conditions and facilitate

17     the escape.  Perhaps most dramatically defendant had

18     smuggled to Guzman in the prison a GPS watch disguised as a

19     food item that facilitated the tunnel engineers' ability to

20     tunnel directly under Guzman's cell.  Thus defendant's acts

21     were important to Guzman's successful escape from Altiplano

22     Prison.

23           After Guzman was recaptured and again sent to

24     Altiplano, defendant was again involved in another escape

25     plan and the distribution of funds to achieve those acts.

1    This plan was thwarted, however, when Guzman was transferred

2    to another prison in Juarez that made escape less feasible.

3    But even while Guzman was held at the Juarez Prison,

4    defendant was involved in supplying funds that resulted in a

5    substantial bribe to prison officials to improve Guzman's

6    prison conditions there.  Thus, Ms. Coronel Aispuro's role

7    in the organization was to assist her husband but did not

8    otherwise involve her directly in the cartel's drug

9    trafficking into the United States, although that was the

10   indirect result of her efforts in support of her husband.

11   Thus, because she aided and abetted the activities of the

12   organization, she did not directly manufacture or distribute

13   controlled substances and, thus, her limited function in the

14   organization merited her mitigating consideration in her

15   guidelines calculations and the application of the safety

16   valve reduction.

17            In order to contextualize the defendant's

18   assistance to her husband, the Court takes into

19   consideration that when their relationship began she was

20   still a minor, and Guzman was several years her elder and

21   already financially successful in the drug trade.

22            Additionally, defendant came from an impoverished

23   family, and her father and brothers were also involved in

24   criminal activity.  Thus the teenage defendant, perhaps

25   naively, considered this relationship to be advantageous to

1    her and her family.  Moreover, the Court is mindful that the

2    defendant is going to have to participate in the raising of

3    her nine-year-old twins because their father, Guzman, will

4    not be able to do so given his long-term incarceration.

5          The Court is to impose a sentence that affords

6    adequate deterrence to criminal conduct and protects the

7    public from further crimes of the defendant.  It is

8    impossible to determine the length of sentence that would be

9    required as a form of deterrence or to protect the public.

10          With respect to the defendant's personal

11   deterrence, her husband's long-term incarceration makes it

12   highly unlikely she will return to the cartel's work given

13   that her efforts were tied directly to him.

14          With respect to general deterrence, defendant

15   played a minimal role in a very large organization.  The

16   harm to the public is from the activities of the cartel

17   generally, not the defendant individually.  The removal of

18   the defendant from the conspiracy since her arrest has not

19   resulted in any less discernible harm caused by the cartel.

20   In fact, one could make a plausible argument that even the

21   removal of Guzman from the conspiracy has not resulted in a

22   reduction of harm to the public.  There appears to be no

23   shortage of willing replacements to fill defendant's slot in

24   the organization, and the Court is skeptical that any of

25   those prospective replacements would be deterred from

1    joining based on whatever sentence I administer here.

2          The Court is to provide the defendant with needed

3    educational or vocational training, medical care, or other

4    correctional treatment in the most effective manner.  The

5    defendant already has a college degree and no significant

6    medical situation has been presented to me requiring special

7    attention.  And while in BOP custody, as recommended by the

8    probation office, the Court will recommend that the

9    defendant participate in the Bureau of Prisons's Parenting

10   Program, which is designed to enhance the participant's

11   relationship with her children while incarcerated.

12         The Court is to consider the kinds of sentences

13   available.  The defendant has been in custody since

14   February 22, 2021, and of course will receive credit for

15   that time, but I need to point out as well, due to COVID,

16   for the entirety of her custody the conditions in which she

17   has been kept are harsher than what they would have been

18   otherwise and will continue to be harsh for the foreseeable

19   future in whatever Bureau of Prisons institution she is kept

20   due to the pandemic.  Moreover, due to her high-profile

21   position she was subject to even harsher conditions of

22   isolation than other defendants being held were subjected to

23   even in light of the COVID requirements.

24         The Court is to consider the kinds of sentence and

25   the sentencing range established for the applicable category

1   of offense committed by the applicable category of defendant

2   as set forth in the guidelines.  The Court has considered

3   the ranges that apply, including the applicable mandatory

4   minimum of ten years, which is made no longer applicable

5   because of her entitlement to the safety valve reduction.

6   No pertinent policy statements issued by the Sentencing

7   Commission has been brought to my attention.

8        The Court is to impose a sentence that avoids

9   unwarranted sentencing disparities among defendants with

10  similar records who have been found guilty of similar

11  conduct.  No general statistics have been brought to my

12  attention, and I did not seek any from the Sentencing

13  Commission.  The government has recommended a sentence of 48

14  months, which is a few months below the bottom end of the

15  guidelines.

16       The Court is partially able to compare the

17  defendant to other Sinaloa Cartel defendants that I have

18  sentenced.  In fact, I believe I have sentenced four others.

19  But the other defendants are not directly comparable because

20  in some cases they testified at Guzman's trial and in all

21  instances committed more serious trafficking crimes and were

22  subject to much harsher guidelines ranges.

23       But the Court can say, however, that in all of the

24  cases but one the Court has imposed a sentence below that

25  recommended by the government, and in this case Ms. Coronel

1    Aispuro stands out in that she has no criminal history, she

2    accepted responsibility for her criminal acts almost

3    immediately upon arrest, and as part of that acceptance has

4    turned over to the government nearly $1.5 million as part of

5    a consent forfeiture order.  As I indicated, there's no

6    restitution at issue here.

7            I will now indicate the sentence to be imposed but

8    will give counsel one more opportunity to make any legal

9    objections to the factors I've considered under the

10   sentencing statute.

11           Any objections from the defense?

12           MR. LICHTMAN:  No, Your Honor.

13           THE COURT:  From the government?

14           MR. NARDOZZI:  No, Your Honor.

15           THE COURT:  All right.  If Ms. Coronel Aispuro can

16   come to the podium.

17           As I indicated, she has been in custody since

18   February 22nd of 2021 and will receive credit for that time

19   served.

20           It is the judgment of the Court that you, Emma

21   Coronel Aispuro, are hereby sentenced to 36 months on Counts

22   1, 2, and 3 to run concurrently.  You are further sentenced

23   to serve concurrent terms of supervised release of 48 months

24   on Count 1 and 36 months on Counts 2 and 3.

25           You are further ordered to pay a $100 special

1    assessment for each count for a total of $300.  The Court

2    finds that you do not have the ability to pay a fine and

3    therefore waives imposition of a fine in this case.

4         The special assessment is immediately payable to

5    the Clerk of the Court for the U.S. District Court for the

6    District of Columbia.  Within 30 days of any change of

7    address, you shall notify the Clerk of the Court of the

8    change until such time as the financial obligation is paid

9    in full.

10        Within 72 hours of release from custody, you shall

11   report in person to the probation office in the district to

12   which you are released.  While on supervision, you shall

13   submit to collection of DNA, you shall not possess a firearm

14   or other dangerous weapon, you shall not use or possess an

15   illegal controlled substance, and you shall not commit

16   another federal, state, or local crime.  You shall also

17   abide by the general conditions of supervision adopted by

18   the U.S. Probation Office which will be set forth in the

19   judgment and commitment order, and no additional special

20   conditions are imposed.

21        Counsel, any reason other than those already

22   stated and argued why the sentence should not be imposed as

23   stated?

24        MR. LICHTMAN:  No, Your Honor.

25        THE COURT:  From the government?

```
 1                  MR. NARDOZZI:  Nothing from the government, Your

 2      Honor.

 3                  THE COURT:  Okay.  I'll go ahead and impose it as

 4      stated.

 5                  Mr. Nardozzi, I gather that she pled guilty to the

 6      three counts of the information so there are no open counts

 7      that need to be dismissed; is that correct?

 8                  MR. NARDOZZI:  No, Your Honor.

 9                  THE COURT:  Okay.  Does the defense want to make

10      any recommendations as to place of custody?

11                  MR. LICHTMAN:  Judge, we would ask for a

12      recommendation in California.

13                  THE COURT:  California.  Any particular facility?

14                  MR. LICHTMAN:  Judge, I would ask for -- she is an

15      American citizen so I would ask for near Los Angeles, Your

16      Honor.

17                  THE COURTROOM DEPUTY:  I'm sorry?

18                  MR. LICHTMAN:  Los Angeles.

19                  THE COURT:  All right.  I will make that

20      recommendation.

21                  MR. LICHTMAN:  Thank you, Your Honor.

22                  THE COURT:  Ms. Coronel Aispuro, you were

23      convicted by plea of guilty.  You can appeal your conviction

24      if you believe that your guilty plea was somehow involuntary

25      or if there's some other fundamental defect in the
```

1    proceedings that was not waived by your guilty plea,

2    although I doubt that your guilty plea didn't waive a number

3    of your appellate rights.

4         You also have a statutory right to appeal your

5    sentence under certain circumstances, and to the extent you

6    choose to appeal you have the right to apply for leave to

7    appeal informa pauperis.  That means without the payment of

8    costs.  And if you request and qualify, the Clerk of the

9    Court will prepare and file a notice of appeal on your

10   behalf although I'll note that you're represented by very

11   able counsel that can assist you in that process.

12        Most importantly, with very few exceptions, any

13   notice of appeal must be filed within 14 days of the entry

14   of the judgment, and because the judgment's going to be

15   pretty straightforward, I expect that that will be entered

16   within the next couple of days; so 14 days from that point,

17   if you choose to appeal.

18        Anything else we need to resolve today?

19        MR. LICHTMAN:  Nothing from the defense, Your

20   Honor.

21        MR. NARDOZZI:  Nothing from the government, Your

22   Honor.

23        THE COURT:  Okay.  Ms. Aispuro, good luck to you.

24   I hope that you raise your twins in a different environment

25   than you've experienced to date.  Good luck.  You're

1    excused.

2                    (Whereupon the hearing was

3                    concluded at 12:56 p.m.)

4

5              **CERTIFICATE OF OFFICIAL COURT REPORTER**

6

7                 I, LISA A. MOREIRA, RDR, CRR, do hereby

8    certify that the above and foregoing constitutes a true and

9    accurate transcript of my stenographic notes and is a full,

10   true and complete transcript of the proceedings to the best

11   of my ability.

12      Dated this 6th day of December, 2021.

13

14                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
15                              United States Courthouse
                                Room 6718
16                              333 Constitution Avenue, NW
                                Washington, DC 20001
17

18

19

20

21

22

23

24

25